IN THE UNITED STATES DISTRICT COURT
F OR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Met International Trading Co, Inc., <br><br> plaintiff, <br><br> v. <br><br> Dario Gerussi and Oracle Contracting Services, Inc., <br><br> defendant. | Cause No. _____ |

**ORIGINAL COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Met International Trading Co., Inc. ("MET") sues Dario Gerussi ("Gerussi") and Oracle Contracting Services, Inc. ("Oracle") (together "Defendants") for violations of federal and state law arising from a concerted scheme to misappropriate MET's trade secrets, gain unauthorized access to MET's computer systems, breach contractual agreements, and interfere with MET's business operations.[1] MET first encountered Brandon Passe, the owner of Oracle, when MET contracted Passe's other company, 49 North LLC ("49

---

[1] On September 19, 2024, Met and Skinner filed an arbitration action against 49 North LLC, Bandon Passe and Oracle Contracting Services, Inc.. in the American Arbitration Association. The action is AAA Case No. 012400078355; *Met International Trading Co., Inc. and Leaveil Skinner, claimants, vs. 49North LLC, Brandon Passe and Oracle Contracting Services, Inc.* Oracle contest that it is subject to an arbitration agreement between Met and Passe (Oracle's owner) and 49North (a business also owned by Passe).

North"), to construct a container home. Following a contract dispute with 49 North over the project, MET discovered that Gerussi, a former MET employee with access to confidential information, had improperly revealed that information to Passe and 49 North.

This lawsuit concerns Gerussi and Oracle's later illegal actions, specifically the unauthorized access of MET's computer systems and misappropriation of trade secrets, allegedly conducted for Oracle's benefit and Passe's direction. MET also seeks a declaratory judgment affirming the validity and enforceability of an arbitration agreement with 49 North and an order compelling the continuation of those arbitration proceedings.

## A. Jurisdiction and venue

1. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) based on claims under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. The Court also has supplemental jurisdiction over related state law claims and the claim for declaratory relief under 28 U.S.C. § 1367.

2. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred within the Southern District of Texas, Houston Division.

**B.  Parties**

3.    MET is a Texas corporation with its principal place of business in Houston, Texas. MET specializes in designing and fabricating custom container buildings and homes.

4.    Gerussi is a former MET employee residing at 10102 Lakeside Gables Dr., Houston, Texas 77065. He was employed by MET from January 13, 2022, to May 9, 2023, as Marketing, Sales, and IT Manager, with access to MET's trade secrets, including proprietary designs, manufacturing processes, customer lists, and pricing strategies.

5.    Oracle is a corporation owned by Brandon Passe, with central business presence in 110 3rd St., Lynden, Washington 98264 and operations in Texas. Oracle competes with MET in the design and construction of buildings. Oracle hired Gerussi on June 13, 2023, shortly after his termination from MET, despite his non-compete agreement.

**C.  Factual background**

6.    On January 13, 2022, MET hired Gerussi under an employment contract containing confidentiality and non-compete provisions (**Exhibit A**). The contract restricted him from working for a competitor in Texas for two years post-termination.

7.    Gerussi managed MET's IT systems, including setting up employee logins and training staff on Slack, phone systems, and Job Boss.

3

8.    When Kierra Coleman was onboarded to Met, Gerussi helped set up her Slack credentials. He was the only person who knew her password.

9.    On March 20, 2023, MET hired Ashley Brooke Weatherred as a Senior Designer & Project Manager under a contract with confidentiality and non-compete provisions (**Exhibit B**).

10.  Weatherred's role included overseeing construction project management, production workflow, compliance, and design coordination.

11.  In February 2023, MET entered a Manufacturing Contract (**Exhibit C**) with 49 North, also owned by Brandon Passe, for constructing a container home.  This contract had an arbitration clause.

12.  MET entrusted Weatherred with development of proprietary architectural designs for container homes, including specialized changes to the 49 North project plans. These designs incorporated MET's trade secrets and proprietary construction methodologies developed through years of experience in container home manufacturing.

13.  On April 17, 2023, MET assigned Kierra Coleman to sales, client management, and project coordination.

14.  On May 9, 2023, Met terminated Dario Gerussi's employment and revoked his access to all company systems, including Slack. Gerussi was explicitly notified that his employment agreement, which had confidentiality provisions, remained in effect after his termination.

4

15. The termination stemmed from MET's discovery that Gerussi was engaging in unauthorized disclosure of MET's confidential information and trade secrets and working against MET's interests while still employed.

16. On June 13, 2023, MET employee Jan Tagalog received a PlanHub notification indicating Gerussi was working for Oracle as an estimator. PlanHub is a cloud-based construction bidding platform. This employment violated Gerussi's non-compete agreement with MET.

17. Oracle's employment of Gerussi was significant given Oracle's public promotion of its use of 'modern technology' and 'proven organizational skills' in construction projects. Despite this sophisticated business model, Oracle had limited experience in container home construction compared to MET's established knowledge.

18. Despite Gerussi knowing his access had been revoked and that his confidentiality obligations prohibited him from accessing or using Met's confidential information, on July 4, 2023, at about 2:43 PM, Met's Slack system was accessed using the login credentials of Met employee Kierra Coleman.

19. Coleman confirmed she did not access the system and had never shared her credentials. Gerussi was the only person who knew Coleman's login information. Gerussi's unauthorized access to MET's Slack system caused the exposure of comprehensive business information, including:

    a.  Detailed container home manufacturing specifications

    b.  Proprietary architectural designs and modifications

    c.  Customer lists and project pipelines

    d.  Pricing models and profit matrices

    e.  Vendor relationships and supply chain strategies

20.  Oracle, which markets itself as using 'modern technology' and 'proven organizational skills' in construction projects, demonstrated sophisticated understanding of digital systems, fully able to under that the significance through its coordinated efforts with Gerussi.

21. MET believes that Gerussi, at the direction of Passe and to benefit Oracle, unlawfully accessed MET's Slack system using Coleman's credentials to obtain MET's confidential information, including proprietary architectural plans, customer lists, pricing models, and project strategies.

22.  Following the unauthorized access, MET incurred substantial costs:

    a.  Digital forensic investigation expenses

    b.  Business operation disruption expenses

    c.  Customer and vendor relationship management costs

23. On April 4, 2024, Weatherred revealed that Oracle, through Passe contacted and paid her to continue developing and updating architectural plans she had developed while at MET in direct violation of her confidentiality obligations. Oracle specifically sought Weatherred's services to obtain MET's proprietary construction methodologies and design specifications.

24. Oracle, lacking significant experience in container home construction, sought to rapidly enter this market by acquiring MET's proprietary information through multiple channels:

    a. Hiring Gerussi despite his non-compete agreement

    b. Obtaining unauthorized access to MET's digital systems

    c. Engaging Weatherred to change and develop MET's proprietary designs

25. On September 19, 2023, MET started arbitration against 49 North, Oracle, and Passe under American Arbitration Association Case No. 012400078355, related to the container home contract dispute. The arbitration agreement in the Manufacturing Contract mandates arbitration for all disputes arising from that contract.

## D. Causes of action

### 1. Count 1: Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030

26. MET's Slack platform is a "protected computer" under 18 U.S.C. § 1030(e)(2) as it:

    a. Operates in interstate commerce through cloud-based services

    b. Contains MET's proprietary business information

    c. Helps with MET's multi-state business operations

27.  Gerussi and Oracle violated 18 U.S.C. § 1030(a)(2)(C) and § 1030(a)(4) by:

    a.  Knowingly accessing MET's protected computer system without authorization

    b.  Using stolen credentials to get around security measure

    c.  Obtaining valuable business information through unauthorized access

    d.  Acting with intent to defraud and convert MET's proprietary information

28.  At the time of the unauthorized access, Gerussi was employed by Oracle Contracting Services, Inc. ("Oracle"), a direct competitor of Met. Oracle and its owner, Brandon Passe, were aware of Gerussi's termination and the unauthorized nature of his access to Met's systems.

29. Gerussi accessed Met's Slack system with fraudulent intent—specifically, to misappropriate confidential trade secrets and proprietary business information for Oracle's competitive advantage. The stolen information included:

    a.  Met's unique business model for container home manufacturing

    b.  Confidential architectural designs (some of which were later changed by a former Met architectural employee also hired by Oracle)

    c.  Customer lists and sales strategies

    d.  Sensitive pricing models and internal project management data

30. On April 4, 2024, Met's former Senior Designer & Project Manager, Ashley Brooke Weatherred, confirmed that Brandon Passe contacted her and paid her to update architectural plans originally developed while she was employed at Met. (Attachment: "Ashley Brooke Weatherred's Admission - Text Messages"). This confirms that Oracle and Passe intended to exploit Met's proprietary information for their own benefit.

31. Gerussi's unauthorized access was not accidental—it was part of an orchestrated scheme by Oracle and Passe to steal Met's trade secrets and use them to improve Oracle's business at Met's expense. This is fraudulent intent under 18 U.S.C. § 1030(a)(4).

32. MET has suffered losses exceeding $5,000 within the meaning of 18 U.S.C. § 1030(c)(4)(A)(i)(I), including:

    a. Investigation costs of the unauthorized access

    b. Security assessment and enhancement expenses

    c. Data restoration and protection measures

    d. Business disruption costs

33. These damages satisfy the loss threshold required under 18 U.S.C. § 1030(c)(4)(A)(i)(I).

34. Oracle knowingly conspired with and induced Gerussi to unlawfully access Met's Slack system. They directed and paid him to obtain confidential business information, knowing that his access had been revoked. Oracle's

sophisticated understanding of technology systems, as shown by its business model and marketing, shows its knowing participation in the unauthorized access scheme. Oracle directed and benefited from unauthorized access to advance its competitive position in the container home market.

### 2.    Count 2: Breach of contract – confidentiality

35.  The Employment Agreement between MET and Gerussi has explicit confidentiality provisions protecting MET's:

    a.  Trade secrets and proprietary information

    b.  Customer and vendor relationships

    c.  Technical specifications and designs

    d.  Business processes and methodologies

36.  Gerussi breached these confidentiality provisions through:

    a.  Unauthorized access to MET's Slack system after termination

    b.  Transfer of proprietary information to Oracle

    c.  Use of MET's confidential information for Oracle's benefit

    d.  Continued exploitation of MET's trade secrets in his role at Oracle

37.  Gerussi's breaches were knowing and intentional, as shown by:

    a.  Use of stolen credentials to access systems

    b.  Timing of access coinciding with Oracle employment

    c.  Pattern of coordinated activities with Oracle

38.  MET has suffered direct and consequential damages from these breaches, including:

a. Loss of competitive advantage

b. Diminished value of trade secrets

c. Market share erosion

d. Customer relationship interference

e. Necessary remediation costs

**3.    Count 3: breach of contract – non-compete agreement**

39.  The Employment Agreement has an enforceable non-compete provision restricting Gerussi from:

a. Working for competitors within specified geographic area

b. Engaging in container home construction business

c. Using MET's proprietary information in competitive activities

40.  Gerussi deliberately breached these restrictions by:

a. Accepting employment with Oracle within restricted period

b. Engaging in direct competition in protected territory

c. Using MET's confidential information in new role

41. MET has suffered direct and consequential damages from these breaches, including:

a. Loss of competitive advantage

b. Diminished value of trade secrets

c. Market share erosion

d. Customer relationship interference

e. Necessary remediation costs

### 4. Count 4: Tortious interference with contract

42. MET maintained valid and enforceable contracts with:

    a. Gerussi, containing confidentiality and non-compete provisions

    b. Weatherred, containing similar protective provisions

43. Oracle and Passe had actual knowledge of these contractual obligations through:

    a. Industry standard practices

    b. Direct business dealings with MET

    c. Oracle's sophisticated business operations in the same market

44. Oracle willfully interfered with these contracts by:

    a. Hiring Gerussi and Weatherred despite known they were bound non-compete restrictions

    b. Directing unauthorized access to MET's systems

    c. Engaging Weatherred to modify MET's designs

    d. Using confidential information obtained through these breaches

45. Oracle interference was without justification or privilege.

46. Oracle's intentional interference directly caused MET:

    a. Loss of proprietary information protection

    b. Competitive market disadvantage

    c. Customer relationship disruption

    d. Necessary remediation expenses

**E.  Civil conspiracy.**

47.  Oracle, Gerussi, and Weatherred engaged in a coordinated scheme to:

   a.  Circumvent contractual protections

   b.  Misappropriate MET's trade secrets

   c.  Establish competing container home operations

48.  The conspiracy progressed through calculated unlawful steps by unlawful means:

   a.  Oracle's strategic hiring of Gerussi

   b.  Unauthorized system access using stolen credentials

   c.  Engagement of Weatherred to change proprietary designs

   d.  Implementation of MET's trade secrets in Oracle's operations

49.  Each participant agreed upon the scheme and then knowingly contributed to the scheme:

   a.  Oracle provided direction and financial benefit

   b.  Gerussi supplied access and insider knowledge

   c.  Weatherred changed protected designs

50.  This coordinated action directly damaged MET through:

   a.  Loss of trade secret protection

   b.  Competitive market injury

   c.  Customer relationship interference

   d.  Necessary security and business remediation costs

## F. Prayer for relief

Met respectfully requests that this Court enter judgment against Gerussi and Weatherred, jointly and severally, for:

a. damages under the CFAA, including compensatory and punitive damages.

b. damages for breach of the confidentiality provision.

c. damages for breach of the non-compete provision.

d. damages for tortious interference with contract.

e. Pre- and post-judgment interest.

f. MET's reasonable attorneys' fees and costs.

g. a permanent injunction against further use or disclosure of MET's trade secrets and confidential information.

h. such other and further relief as this Court considers fair.

Dated: 7 February 2025

Respectfully submitted,


By:   _/s/ Scott M Clearman_
        Scott M. Clearman
        Texas Bar No. 04350090
        THE CLEARMAN LAW FIRM PLLC
        2335 Richton St.
        Houston, Texas 77098
        Telephone: 713-304-9669
        Email: scott@clearmanlaw.com

## *EMPLOYMENT CONTRACT*

This Employment Contract (this "Contract") is made effective as of March 20th , 2023, by and between Met International Trading Company, Inc. DBA Met International Company INC. of 922 Hill Road, Houston, 77037 and Ashley Brooke Weatherred of ███████████ Dr Houston Tx 77063

    A. Met International Trading Company, Inc. DBA Met International Company INC. is engaged in the business of Metal Fabrication Company. Ashley Brooke Weatherred will primarily perform the job duties at the following location: 922 Hill Road, Houston, Texas. Or remotely based on business needs.

    B. Met International Trading Company, Inc. DBA Met International Company INC. desires to have the services of Ashley Brooke Weatherred.

    C. Ashley Brooke Weatherred is a Senior Designer and Project Manager at will employee of Met International Trading Company, Inc. DBA Met International Company INC. Either party can terminate the employment agreement at any time.

Therefore, the parties agree as follows:

**1. EMPLOYMENT.** Met International Trading Company, Inc. DBA Met International Company INC. shall employ Ashley Brooke Weatherred as a(n) Senior Designer & Project Manager. Ashley Brooke Weatherred accepts and agrees to such employment, and agrees to be subject to the general supervision, advice and direction of Met International Trading Company, Inc. DBA Met International Company INC. and Met International Trading Company, Inc. DBA Met International Company INC.'s supervisory personnel. Ashley Brooke Weatherred shall provide to Met International Trading Company, Inc. DBA Met International Company INC. the following services:

- Developing, organizing, and reviewing building plans
- Preparing construction contracts for general contractors
- Interviewing and hiring contractors for projects
- Formulating cost estimates based on equipment, materials, and labor requirements.
- Ensuring that construction projects meet environmental, safety, structural, zoning, and aesthetic standards.
- Determining and scheduling different stages of the building process, in accordance with the client needs.
- Monitoring the progress of the project and ascertain whether phases of the construction process are following building plans and project deadlines.
- After building completion, project managers may provide additional services for expansion and relocation projects.
- Supports the Production team and assists the team by focusing on
- schedules, velocity tracking, and dependency management.

Exhibit A

• Works with the leads and production team to develop and track against a production plan reflective of the defined project goals as set by the customer.
• Anticipates bottlenecks, clarifies project priorities, identifies risks, and escalates issues that cannot be internally resolved.
• Clearly defines all workflows, communicates documented processes, and ensures all practices are being refined and tuned with learnings.
• Provides regular status reports and capacity plan updates with the team and with management.
• Advising distributors and dealers on policies and Standard Operating Procedures (SOPs)
• Gaining an understanding of the client's needs and requirements and communicating them and the quality standards to the production teams.
• Devising ways to improve the manufacturing process to ensure higher quality goods.
• Devising, improving, and reviewing new specifications and procedures for products or processes, and training staff to use them.
• Setting the requirements for raw materials from suppliers and monitoring their compliance.
• Ensuring legal obligations are followed and ensuring compliance with regulatory bodies and with health and safety guidelines.
• Overseeing product development procedures to identify any deviations from quality standards.
• Inspecting the final output, comparing it to the requirements, and approving or rejecting the final products.
• Keeping accurate documentation and performing statistical analysis.
• Gaining feedback from the clients, attending meetings, submitting reports, and assisting external auditors and inspectors.
• Use computer-aided design (CAD) software to create drawings and plans
• Collaborate with engineers on projects
• Determine the proper size and materials for products

Ashley Brooke Weatherred shall also perform (i) such other duties as are customarily performed by an employee in a similar position, and (ii) such other and unrelated services and duties as may be assigned to Ashley Brooke Weatherred from time to time by Met International Trading Company, Inc. DBA Met International Company INC..

**2. BEST EFFORTS OF EMPLOYEE.** Ashley Brooke Weatherred agrees to perform faithfully, industriously, and to the best of Ashley Brooke Weatherred 's ability, experience, and talents, all of the duties that may be required by the express and implicit terms of this Contract, to the reasonable satisfaction of Met International Trading Company, Inc. DBA Met International Company INC. Such duties shall be provided at such place(s) as the needs, business, or opportunities of Met International Trading Company, Inc. DBA Met International Company INC. may require from time to time.

**3. OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email

addresses, blogs, Twitter, Facebook, YouTube, or other social media networks) used or created on behalf of Met International Trading Company, Inc. DBA Met International Company INC. are the property of Met International Trading Company, Inc. DBA Met International Company INC..

**4. COMPENSATION OF EMPLOYEE.** As compensation for the services provided by Ashley Brooke Weatherred under this Contract, Met International Trading Company, Inc. DBA Met International Company INC. will pay Ashley Brooke Weatherred  an annual salary of $65,000.00 payable on Friday of every other week and subject to applicable federal, state, and local withholding. Upon termination of this Contract, payments under this paragraph shall cease; provided, however, that Ashley Brooke Weatherred shall be entitled to payments for periods or partial periods that occurred prior to the date of termination and for which Ashley Brooke Weatherred has not yet been paid, and for any commission earned in accordance with Met International Trading Company, Inc. DBA Met International Company INC.'s customary procedures, if applicable. Accrued vacation will be paid in accordance with state law and Met International Trading Company, Inc. DBA Met International Company INC.'s customary procedures. This section of the Contract is included only for accounting and payroll purposes and should not be construed as establishing a minimum or definite term of employment.

**5. COMMISSION PAYMENTS.** In addition to the payments under the preceding paragraph, Met International Trading Company, Inc. DBA Met International Company INC. will make commission payments to Ashley Brooke Weatherred based on 1% of Gross Sales included as a part of Quotation to Customers for Sales generated by Ashley Brooks, 1% commission for Architectural and Design work provided on projects worked on by Ashley Brooke Weatherred and 1% commission for project management on projects sold and generated by others. In addition when services are provided by Ashley Brooke Weatherred for commercial projects where we are not completing the build out in house the compensation will be (Ashley's fee (50%)+ Met Co's fee (50%) = Clients fee).This commission will be paid bi-weekly based on regular pay schedules in the following pay period after payment is received from customer. Upon request by Ashley Brooke Weatherred, Met International Trading Company, Inc. DBA Met International Company INC. may make advances against expected commissions in accordance with Met International Trading Company, Inc. DBA Met International Company INC.'s usual policies.

**6. EXPENSE REIMBURSEMENT.** Met International Trading Company, Inc. DBA Met International Company INC. will reimburse Ashley Brooke Weatherred for "out-of-pocket" expenses incurred by Ashley Brooke Weatherred in accordance with Met International Trading Company, Inc. DBA Met International Company INC.'s policies in effect from time to time.

**7. RECOMMENDATIONS FOR IMPROVING OPERATIONS.** Ashley Brooke Weatherred shall provide Met International Trading Company, Inc. DBA Met International Company INC. with all information, suggestions, and recommendations regarding Met International Trading Company, Inc. DBA Met International Company INC.'s business, of which Ashley Brooke Weatherred has knowledge, that will be of benefit to Met International Trading Company, Inc. DBA Met International Company INC.

**8. CONFIDENTIALITY.** Ashley Brooke Weatherred recognizes that Met International Trading Company, Inc. DBA Met International Company INC. has and will have information regarding the following:

- inventions
- products
- product design
- processes
- technical matters
- trade secrets
- copyrights
- customer lists
- prices
- costs
- discounts
- business affairs
- future plans
- Any other information deemed confidential.

and other vital information items (collectively, "Information") which are valuable, special and unique assets of Met International Trading Company, Inc. DBA Met International Company INC. Ashley Brooke Weatherred agrees that Ashley Brooke Weatherred will not at any time or in any manner, either directly or indirectly, divulge, disclose, or communicate any Information to any third party without the prior written consent of Met International Trading Company, Inc. DBA Met International Company INC.. Ashley Brooke Weatherred will protect the Information and treat it as strictly confidential. A violation by Ashley Brooke Weatherred of this paragraph shall be a material violation of this Contract and will justify legal and/or equitable relief.

This Agreement is in compliance with the Defend Trade Secrets Act and provides civil or criminal immunity to any individual for the disclosure of trade secrets: (i) made in confidence to a federal, state, or local government official, or to an attorney when the disclosure is to report suspected violations of the law; or (ii) in a complaint or other document filed in a lawsuit if made under seal.

**9. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Ashley Brooke Weatherred has disclosed (or has threatened to disclose) Information in violation of this Contract, Met International Trading Company, Inc. DBA Met International Company INC. shall be entitled to an injunction to restrain Ashley Brooke Weatherred from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Met International Trading Company, Inc. DBA Met International Company INC. shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages.

**10. CONFIDENTIALITY AFTER TERMINATION OF EMPLOYMENT.** The confidentiality provisions of this Contract shall remain in full force and effect for a period of 5 years after the voluntary or involuntary termination of Ashley Brooke Weatherred 's employment. During such period, neither party shall make or permit the making of any public

announcement or statement of any kind that Ashley Brooke Weatherred was formerly employed by or connected with Met International Trading Company, Inc. DBA Met International Company INC.

**11. NON-COMPETE AGREEMENT.** Ashley Brooke Weatherred recognizes that the various items of Information are special and unique assets of the company and need to be protected from improper disclosure. In consideration of the disclosure of the Information to Ashley Brooke Weatherred, Ashley Brooke Weatherred agrees and covenants that during his or her employment by Met International Trading Company, Inc. DBA Met International Company INC. and for a period of 2 years following the termination of Ashley Brooke Weatherred 's employment, whether such termination is voluntary or involuntary, Ashley Brooke Weatherred  will not directly or indirectly engage or do business with the following competitor(s):

NA

This covenant shall apply to the geographical area that includes all of the State of Texas. Directly or indirectly engaging in any competitive business includes, but is not limited to: (i) engaging in a business as owner, partner, or agent, (ii) becoming an employee of any third party that is engaged in such business, (iii) becoming interested directly or indirectly in any such business, or (iv) soliciting any customer of Met International Trading Company, Inc. DBA Met International Company INC. for the benefit of a third party that is engaged in such business. Ashley Brooke Weatherred agrees that this non-compete provision will not adversely affect Ashley Brooke Weatherred 's livelihood.

**12. EMPLOYEE'S INABILITY TO CONTRACT FOR EMPLOYER.** Ashley Brooke Weatherred shall not have the right to make any contracts or commitments for or on behalf of Met International Trading Company, Inc. DBA Met International Company INC. without first obtaining the express written consent of Met International Trading Company, Inc. DBA Met International Company INC.

**13. BENEFITS.** Ashley Brooke Weatherred shall be entitled to employment benefits, as provided by Met International Trading Company, Inc. DBA Met International Company INC.'s policies in effect during the term of employment. These benefits include:
    - Vacation

**14. TERM/TERMINATION.** Ashley Brooke Weatherred 's employment under this Contract shall be for an unspecified term on an "at will" basis. This Contract may be terminated by Met International Trading Company, Inc. DBA Met International Company INC. upon 10 written notice, and by Ashley Brooke Weatherred upon 30 written notice. If Ashley Brooke Weatherred is in violation of this Contract, Met International Trading Company, Inc. DBA Met International Company INC. may terminate employment without notice and with compensation to Ashley Brooke Weatherred  only to the date of such termination. The compensation paid under this Contract shall be Ashley Brooke Weatherred 's exclusive remedy.

**15. TERMINATION FOR DISABILITY.** Met International Trading Company, Inc. DBA Met International Company INC. shall have the option to terminate this Contract, if Ashley Brooke

Weatherred becomes permanently disabled and is no longer able to perform the essential functions of the position with reasonable accommodation. Met International Trading Company, Inc. DBA Met International Company INC. shall exercise this option by giving 30 Days written notice to Ashley Brooke Weatherred.

**16. COMPLIANCE WITH EMPLOYER'S RULES.** Ashley Brooke Weatherred agrees to comply with all of the rules and regulations of Met International Trading Company, Inc. DBA Met International Company INC..

**17. RETURN OF PROPERTY.** Upon termination of this Contract, Ashley Brooke Weatherred shall deliver to Met International Trading Company, Inc. DBA Met International Company INC. all property which is Met International Trading Company, Inc. DBA Met International Company INC.'s property or related to Met International Trading Company, Inc. DBA Met International Company INC.'s business (including keys, records, notes, data, memoranda, models, and equipment) that is in Ashley Brooke Weatherred 's possession or under Ashley Brooke Weatherred 's control. Such obligation shall be governed by any separate confidentiality or proprietary rights agreement signed by Ashley Brooke Weatherred.

**18. NOTICES.** All notices required or permitted under this Contract shall be in writing and shall be deemed delivered when delivered in person or on the third day after being deposited in the United States mail, postage paid, addressed as follows:

Employer:

Met International Trading Company, Inc. DBA Met International Company INC.
Leaveil Skinner
CEO
922 Hill Road
Houston, 77037

Employee:

Ashley Brooke Weatherred
13100 Wortham Center Dr 3rd Floor |
Houston Tx 77065

Such addresses may be changed from time to time by either party by providing written notice in the manner set forth above.

**19. ENTIRE AGREEMENT.** This Contract contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Contract supersedes any prior written or oral agreements between the parties.

**20. AMENDMENT.** This Contract may be modified or amended, if the amendment is made in writing and is signed by both parties.

**21. SEVERABILITY.** If any provisions of this Contract shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**22. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Contract shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Contract.

**23. APPLICABLE LAW.** This Contract shall be governed by the laws of the State of Texas.

**24. SIGNATORIES.** This Contract shall be signed by Leaveil Skinner, CEO on behalf of Met International Trading Company, Inc. DBA Met International Company INC. and by Ashley Brooke Weatherred in an individual capacity. This Contract is effective as of the date first above written.

By: *Leaveil Skinner*                    Date: 03/23/23

Leaveil Skinner, CEO
Met International Trading Company, Inc. DBA Met International Company INC.

By: *Ashley Brooke Weatherred*                    Date: 03/23/23

Ashley Brooke Weatherred

Authentisign ID: 3FFC93BC-5A92-4586-AE38-C0A5C7D43F1F

# *EMPLOYMENT CONTRACT*

This Employment Contract (this "Contract") is made effective as of January 13, 2022, by and between Met International Trading Company, Inc. DBA Met International Company INC. of 922 Hill Road, Houston, 77037 and Dario Gerussi of 10102 Lakeside Gables Dr., Houston, Texas, 77065.

    A. Met International Trading Company, Inc. DBA Met International Company INC. is engaged in the business of Metal Fabrication. Dario Gerussi will primarily perform the job duties at the following location: 922 Hill Road, Houston, Texas.

    B. Met International Trading Company, Inc. DBA Met International Company INC. desires to have the services of Dario Gerussi.

    C. Dario Gerussi is an Sales and IT Manager at will employee of Met International Trading Company, Inc. DBA Met International Company INC.. Either party is able to terminate the employment agreement at any time.

Therefore, the parties agree as follows:

**1. EMPLOYMENT.** Met International Trading Company, Inc. DBA Met International Company INC. shall employ Dario Gerussi as a(n) Marketing, Sales and IT Manager. Dario Gerussi accepts and agrees to such employment, and agrees to be subject to the general supervision, advice and direction of Met International Trading Company, Inc. DBA Met International Company INC. and Met International Trading Company, Inc. DBA Met International Company INC.'s supervisory personnel. Dario Gerussi shall provide to Met International Trading Company, Inc. DBA Met International Company INC. the following services:

Developing marketing strategies for new products.
• Organizing promotional events and coordinating day-of deliveries and staffing.
• Leading and training a team of Marketing Associates.
• Reviewing current marketing campaigns for weaknesses and developing solutions within budget constraints.
• Analyzing website click-to-purchase conversion rates and the effectiveness of promotions to determine what drives sales.
• JobBoss integration implementation.
• Building and maintain Met websites
• Generating sales via cold calling on a daily basis and set appointments.
• Researching new products for Production.
• Weekly shop time to look for ways to market and brand products.
• Lighting assessment of facility and office and recommend updating system.
• Identify prospective customers, lead generation and conversion methods.
• Negotiate prices and terms and prepare sales agreements for new orders.

Exhibit B

Authentisign ID: 3FFC93BC-5A92-4586-AE38-C0A5C7D43F1F

- Collaborate with colleagues in many different sectors to find new products.
- Maintain contact lists and follow up with customers weekly to offer services.
- Review diagnostics and assess the functionality and efficiency of systems
- Implement security measures.
- Monitor security certificates and company compliance for office and Facility.
- Offer technical support to company staff and troubleshoot computer related problems.
- Install and update company software and hardware as needed on all computers.
- Anticipate and report the cost of replacing or updating computer items.

Dario Gerussi shall also perform (i) such other duties as are customarily performed by an employee in a similar position, and (ii) such other and unrelated services and duties as may be assigned to Dario Gerussi from time to time by Met International Trading Company, Inc. DBA Met International Company INC..

**2. BEST EFFORTS OF EMPLOYEE.** Dario Gerussi agrees to perform faithfully, industriously, and to the best of Dario Gerussi's ability, experience, and talents, all of the duties that may be required by the express and implicit terms of this Contract, to the reasonable satisfaction of Met International Trading Company, Inc. DBA Met International Company INC.. Such duties shall be provided at such place(s) as the needs, business, or opportunities of Met International Trading Company, Inc. DBA Met International Company INC. may require from time to time.

**3. OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email addresses, blogs, Twitter, Facebook, YouTube, or other social media networks) used or created on behalf of Met International Trading Company, Inc. DBA Met International Company INC. are the property of Met International Trading Company, Inc. DBA Met International Company INC..

**4. COMPENSATION OF EMPLOYEE.** As compensation for the services provided by Dario Gerussi under this Contract, Met International Trading Company, Inc. DBA Met International Company INC. will pay Dario Gerussi an annual salary of $30,000.00 payable on Friday of every other week and subject to applicable federal, state, and local withholding. Upon termination of this Contract, payments under this paragraph shall cease; provided, however, that Dario Gerussi shall be entitled to payments for periods or partial periods that occurred prior to the date of termination and for which Dario Gerussi has not yet been paid, and for any commission earned in accordance with Met International Trading Company, Inc. DBA Met International Company INC.'s customary procedures, if applicable. Accrued vacation will be paid in accordance with state law and Met International Trading Company, Inc. DBA Met International Company INC.'s customary procedures. This section of the Contract is included only for accounting and payroll purposes and should not be construed as establishing a minimum or definite term of employment.

**5. COMMISSION PAYMENTS.** In addition to the payments under the preceding paragraph, Met International Trading Company, Inc. DBA Met International Company INC. will make commission payments to Dario Gerussi based on 2.5% of Gross Sales included as a part of

Quotation to Customers with a minimum of 20% Gross Profit Margin of Metal Fabrication Sales. This commission will be paid monthly on the twenty-fifth day of the following month. Upon request by Dario Gerussi, Met International Trading Company, Inc. DBA Met International Company INC. will make advances against expected commissions in accordance with Met International Trading Company, Inc. DBA Met International Company INC.'s usual policies.

**6. EXPENSE REIMBURSEMENT.** Met International Trading Company, Inc. DBA Met International Company INC. will reimburse Dario Gerussi for "out-of-pocket" expenses incurred by Dario Gerussi in accordance with Met International Trading Company, Inc. DBA Met International Company INC.'s policies in effect from time to time.

**7. RECOMMENDATIONS FOR IMPROVING OPERATIONS.** Dario Gerussi shall provide Met International Trading Company, Inc. DBA Met International Company INC. with all information, suggestions, and recommendations regarding Met International Trading Company, Inc. DBA Met International Company INC.'s business, of which Dario Gerussi has knowledge, that will be of benefit to Met International Trading Company, Inc. DBA Met International Company INC..

**8. CONFIDENTIALITY.** Dario Gerussi recognizes that Met International Trading Company, Inc. DBA Met International Company INC. has and will have information regarding the following:
- inventions
- products
- product design
- processes
- technical matters
- trade secrets
- copyrights
- customer lists
- prices
- costs
- discounts
- business affairs
- future plans
- Any other information deemed confidential.

and other vital information items (collectively, "Information") which are valuable, special and unique assets of Met International Trading Company, Inc. DBA Met International Company INC.. Dario Gerussi agrees that Dario Gerussi will not at any time or in any manner, either directly or indirectly, divulge, disclose, or communicate any Information to any third party without the prior written consent of Met International Trading Company, Inc. DBA Met International Company INC.. Dario Gerussi will protect the Information and treat it as strictly confidential. A violation by Dario Gerussi of this paragraph shall be a material violation of this Contract and will justify legal and/or equitable relief.

This Agreement is in compliance with the Defend Trade Secrets Act and provides civil or criminal immunity to any individual for the disclosure of trade secrets: (i) made in confidence to

a federal, state, or local government official, or to an attorney when the disclosure is to report suspected violations of the law; or (ii) in a complaint or other document filed in a lawsuit if made under seal.

**9. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Dario Gerussi has disclosed (or has threatened to disclose) Information in violation of this Contract, Met International Trading Company, Inc. DBA Met International Company INC. shall be entitled to an injunction to restrain Dario Gerussi from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Met International Trading Company, Inc. DBA Met International Company INC. shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages.

**10. CONFIDENTIALITY AFTER TERMINATION OF EMPLOYMENT.** The confidentiality provisions of this Contract shall remain in full force and effect for a period of 5 years after the voluntary or involuntary termination of Dario Gerussi's employment. During such period, neither party shall make or permit the making of any public announcement or statement of any kind that Dario Gerussi was formerly employed by or connected with Met International Trading Company, Inc. DBA Met International Company INC..

**11. NON-COMPETE AGREEMENT.** Dario Gerussi recognizes that the various items of Information are special and unique assets of the company and need to be protected from improper disclosure. In consideration of the disclosure of the Information to Dario Gerussi, Dario Gerussi agrees and covenants that during his or her employment by Met International Trading Company, Inc. DBA Met International Company INC. and for a period of 2 years following the termination of Dario Gerussi's employment, whether such termination is voluntary or involuntary, Dario Gerussi will not directly or indirectly engage or do business with the following competitor(s):

- Metal Fabrication Companies

This covenant shall apply to the geographical area that includes all of the State of Texas. Directly or indirectly engaging in any competitive business includes, but is not limited to: (i) engaging in a business as owner, partner, or agent, (ii) becoming an employee of any third party that is engaged in such business, (iii) becoming interested directly or indirectly in any such business, or (iv) soliciting any customer of Met International Trading Company, Inc. DBA Met International Company INC. for the benefit of a third party that is engaged in such business. Dario Gerussi agrees that this non-compete provision will not adversely affect Dario Gerussi's livelihood.

**12. EMPLOYEE'S INABILITY TO CONTRACT FOR EMPLOYER.** Dario Gerussi shall not have the right to make any contracts or commitments for or on behalf of Met International Trading Company, Inc. DBA Met International Company INC. without first obtaining the express written consent of Met International Trading Company, Inc. DBA Met International Company INC..

Authentisign ID: 3FFC93BC-5A92-4586-AE38-C0A5C7D43F1F

**13. BENEFITS.** Dario Gerussi shall be entitled to employment benefits, as provided by Met International Trading Company, Inc. DBA Met International Company INC.'s policies in effect during the term of employment. These benefits include:

    - Vacation

**14. TERM/TERMINATION.** Dario Gerussi's employment under this Contract shall be for an unspecified term on an "at will" basis. This Contract may be terminated by Met International Trading Company, Inc. DBA Met International Company INC. upon 10 day written notice, and by Dario Gerussi upon 30 day written notice. If Dario Gerussi is in violation of this Contract, Met International Trading Company, Inc. DBA Met International Company INC. may terminate employment without notice and with compensation to Dario Gerussi only to the date of such termination. The compensation paid under this Contract shall be Dario Gerussi's exclusive remedy.

**15. TERMINATION FOR DISABILITY.** Met International Trading Company, Inc. DBA Met International Company INC. shall have the option to terminate this Contract, if Dario Gerussi becomes permanently disabled and is no longer able to perform the essential functions of the position with reasonable accommodation. Met International Trading Company, Inc. DBA Met International Company INC. shall exercise this option by giving 30 Days written notice to Dario Gerussi.

**16. COMPLIANCE WITH EMPLOYER'S RULES.** Dario Gerussi agrees to comply with all of the rules and regulations of Met International Trading Company, Inc. DBA Met International Company INC..

**17. RETURN OF PROPERTY.** Upon termination of this Contract, Dario Gerussi shall deliver to Met International Trading Company, Inc. DBA Met International Company INC. all property which is Met International Trading Company, Inc. DBA Met International Company INC.'s property or related to Met International Trading Company, Inc. DBA Met International Company INC.'s business (including keys, records, notes, data, memoranda, models, and equipment) that is in Dario Gerussi's possession or under Dario Gerussi's control. Such obligation shall be governed by any separate confidentiality or proprietary rights agreement signed by Dario Gerussi.

**18. NOTICES.** All notices required or permitted under this Contract shall be in writing and shall be deemed delivered when delivered in person or on the third day after being deposited in the United States mail, postage paid, addressed as follows:

Employer:

Met International Trading Company, Inc. DBA Met International Company INC.
Leaveil Skinner
CEO
922 Hill Road
Houston, 77037

Employee:

Dario Gerussi
10102 Lakeside Gables Dr.
Houston, Texas 77065

Such addresses may be changed from time to time by either party by providing written notice in the manner set forth above.

**19. ENTIRE AGREEMENT.** This Contract contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Contract supersedes any prior written or oral agreements between the parties.

**20. AMENDMENT.** This Contract may be modified or amended, if the amendment is made in writing and is signed by both parties.

**21. SEVERABILITY.** If any provisions of this Contract shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**22. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Contract shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Contract.

**23. APPLICABLE LAW.** This Contract shall be governed by the laws of the State of Texas.

**24. SIGNATORIES.** This Contract shall be signed by Leaveil Skinner, CEO on behalf of Met International Trading Company, Inc. DBA Met International Company INC. and by Dario Gerussi in an individual capacity. This Contract is effective as of the date first above written.

By: *Leaveil Skinner*                          Date:  03/22/2022
3/22/2022 7:50:24 AM GMT
Leaveil Skinner, CEO
Met International Trading Company, Inc. DBA Met International Company INC.

By: *Dario Gerussi*                          Date:  03/23/2022
3/23/2022 6:58:50 PM GMT
Dario Gerussi

Authentisign ID: BC4EA0F9-46AE-ED11-9174-0050F2765AB1

## *MANUFACTURING CONTRACT*

Order Number: J16284/35-IFB-23- 009

This Contract (this "Contract") is made effective as of February 15, 2023, by and between Met International Trading Company Inc., of 922 Hill Rd, Houston, Texas 77037, (Met Containers), and Brandon Passe & 49 North LLC, of 3957 Irongate Rd. #100 Bellingham, WA 98226 (49 North LLC).

**1. PURPOSE OF CONTRACT.** 49 North LLC is in the business of Property Development. Met Containers agrees to produce 49 North LLC's product(s), hereinafter referred to as the "Goods", in the quantity, price, and specifications determined in this agreement.

**2. MANUFACTURED ITEMS.** Met Containers agrees to sell, and 49 North LLC agrees to buy, the following products (the "Goods") in accordance with the terms and conditions of this Contract:

| *Description* | *Quantity* | *Unit Price* | *Total Price* |
|---|---|---|---|
| Parker Base Plan Container Home 3 - 40' Containers | 1 | $214,650.00 | $214,650.00 |
| TOTAL | | | $214,650.00 |

**3. PRODUCT STANDARDS.** The Goods shall comply with the specifications in the attached Estimate with Order Number: J16284/35-IFB-23- 009 known as Exhibit A and incorporated into this Contract by this reference.

**4. TITLE/RISK OF LOSS.** Buyer shall pay reasonable shipping costs in accordance with its shipping instructions, but Seller shall be responsible for packaging, shipping and safe delivery and shall bear all risk of damage or loss until the goods are delivered to the Buyer's address.

**5. PAYMENT.** Payment shall be made to Met International Trading Company Inc. @ 922 Hill Rd, Houston, Texas 77037.

49 North LLC agrees to pay Met Containers as follows:

10% Down to initiate planning, 50% down to Start Manufacturing, 20% upon completion prior to Delivery with 20% after delivery and installation.

If any invoice is not paid when due, interest will be added to and payable on all overdue amounts at 15 percent per year, or the maximum percentage allowed under applicable laws, whichever is less. Brandon Passe & 49 North LLC shall pay all costs of collection, including without limitation, reasonable attorney fees.

In addition to any other right or remedy provided by law, if 49 North LLC fails to pay for the Goods when due, Met Containers has the option to treat such failure to pay as a material breach of this Contract, and may cancel this Contract and/or seek legal remedies.

**6. DELIVERY.** Time is of the essence in the performance of this Contract. Met Containers will arrange for delivery by carrier chosen by 49 North LLC. Delivery shall be completed by May 01, 2023.

Garfield St. Sumas, WA 98295

**7. PAYMENT OF TAXES.** 49 North LLC agrees to pay all taxes of every description, federal, state, and municipal, that arise as a result of this sale, excluding income taxes.

Exhibit C

**8. INDEMNITY AND INSURANCE.** Met Containers agrees to hold 49 North LLC harmless and to defend any and all actions, claims, suits, or proceedings that may subject 49 North LLC to liability for defects in the Products. Met Containers represents that it now has in force a valid comprehensive liability insurance policy in the amount of $2,000,000.00 with Liberty Mutual BLS (23) 64 90 01 27, and that the policy covers the risk of liability for defects in the Products. If this insurance coverage should change or lapse, Met Containers agrees that 49 North LLC may pay the insurance premiums and deduct this expenditure from the payment due on the Products, beginning with the first shipment of Products following the expenditure.

**9. WARRANTIES.** Met Containers warrants that the Goods shall be free of substantive defects in material and workmanship and in conformance with industry standards.

MET CONTAINERS SHALL IN NO EVENT BE LIABLE FOR ANY INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES OF ANY NATURE, EVEN IF MET CONTAINERS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**10. INSPECTION.** 49 North LLC, upon receiving possession of the Goods, shall have a reasonable opportunity to inspect the Goods to determine if the Goods conform to the requirements of this Contract. If 49 North LLC, in good faith, determines that all or a portion of the Goods are non-conforming, 49 North LLC may return the Goods to Met Containers at Met Container's expense. 49 North LLC must provide written notice to Met Containers of the reason for rejecting the Goods. Met Containers will have 30 days from the return of the Goods to remedy such defects under the terms of this Contract.

**11. DEFAULT.** The occurrence of any of the following shall constitute a material default under this Contract:

a. The failure to make a required payment when due.

b. The insolvency or bankruptcy of either party.

c. The subjection of any of either party's property to any levy, seizure, general assignment for the benefit of creditors, application or sale for or by any creditor or government agency.

d. The failure to make available or deliver the Goods in the time and manner provided for in this Contract.

**12. REMEDIES ON DEFAULT.** In addition to any and all other rights a party may have available according to law, if a party defaults by failing to substantially perform any provision, term or condition of this Contract (including without limitation the failure to make a monetary payment when due), the other party may terminate the Contract by providing written notice to the defaulting party. This notice shall describe with sufficient detail the nature of the default. The party receiving such notice shall have 30 days from the effective date of such notice to cure the default(s). Unless waived by a party providing notice, the failure to cure the default(s) within such time period shall result in the automatic termination of this Contract.

**13. FORCE MAJEURE.** If performance of this Contract or any obligation under this Contract is prevented, restricted, or interfered with by causes beyond either party's reasonable control ("Force Majeure"), and if the party unable to carry out its obligations gives the other party prompt written notice of such event, then the obligations of the party invoking this provision shall be suspended to the extent necessary by such event. The term Force Majeure shall include, without limitation, acts of God, plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine or other employee restrictions, fire, explosion, vandalism, storm or other similar occurrence, orders or acts of military or civil authority, or by national emergencies, insurrections, riots, or wars, or strikes, lock-outs, work stoppages, or supplier failures. The excused party shall use reasonable efforts under the circumstances to avoid or remove such causes of non-performance and shall proceed to perform with reasonable dispatch whenever such causes are removed or ceased. An act or omission shall be deemed within the reasonable control of a party if committed, omitted, or caused by a party, or its employees, officers, agents, or affiliates.

**14. ARBITRATION.** Any controversies or disputes arising out of or relating to this Contract shall be resolved by binding arbitration in accordance with the then-current Commercial Arbitration Rules of the American Arbitration Association.

Authentision ID: BC4EA0F946AE-ED11-9174-0050F2764AB1

The parties shall select a mutually acceptable arbitrator knowledgeable about issues relating to the subject matter of this Contract. In the event the parties are unable to agree to such a selection, each party will select an arbitrator and the two arbitrators in turn shall select a third arbitrator, all three of whom shall preside jointly over the matter. The arbitration shall take place at a location that is reasonably centrally located between the parties, or otherwise mutually agreed upon by the parties. All documents, materials, and information in the possession of each party that are in any way relevant to the dispute shall be made available to the other party for review and copying no later than 30 days after the notice of arbitration is served. The arbitrator(s) shall not have the authority to modify any provision of this Contract or to award punitive damages. The arbitrator(s) shall have the power to issue mandatory orders and restraint orders in connection with the arbitration. The decision rendered by the arbitrator(s) shall be final and binding on the parties, and judgment may be entered in conformity with the decision in any court having jurisdiction. The agreement to arbitration shall be specifically enforceable under the prevailing arbitration law. During the continuance of any arbitration proceeding, the parties shall continue to perform their respective obligations under this Contract.

Both parties acknowledge that during the course of this Contract, each may obtain confidential information regarding the other party's business. Both parties agree to treat all such information and the terms of this Contract as confidential and to take all reasonable precautions against disclosure of such information to unauthorized third parties during and after the term of this Contract. Upon request by an owner, all documents relating to the confidential information will be returned to such owner.

**15. CONFIDENTIALITY.** Upon termination of this Contract, Met Containers will return to 49 North LLC all records, notes, documentation and other items that were used, created, or controlled by Met Containers during the term of this Contract.

**16. NOTICE.** Any notice or communication required or permitted under this Contract shall be sufficiently given if delivered in person or by certified mail, return receipt requested, to the addresses listed above or to such other address as one party may have furnished to the other in writing. The notice shall be deemed received when delivered or signed for, or on the third day after mailing if not signed for.

**ENTIRE CONTRACT.** This Contract contains the entire agreement of the parties regarding the subject matter of this Contract, and there are no other promises or conditions in any other agreement whether oral or written. This Contract supersedes any prior written or oral agreements between the parties.

**18. AMENDMENT.** This Contract may be modified or amended if the amendment is made in writing and signed by both parties.

**19. SEVERABILITY.** If any provision of this Contract shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Contract is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**20. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Contract shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Contract.

**21. ATTORNEY'S FEES.** If any action at law or in equity is brought to enforce or interpret the provisions of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees in addition to any other relief to which that party may be entitled.

**22. HEADINGS.** Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

**APPLICABLE LAW.** This Contract shall be governed by the laws of the State of Texas.

**24. SIGNATURES.** This Contract shall be signed on behalf of Brandon Passe & 49 North LLC by Brandon Passe, Owner, and on behalf of Met International Trading Company Inc. by Leaveil Skinner, CEO.

Buyer

*Brandon Passe*

Date: 02/16/23

.ndon Passe & 49 North LLC
Owner

Manufacturer:
Met International Trading Company Inc.

By: *Leaveil Skinner*

Date: 02/16/23

Leaveil Skinner
CEO